1
2
3
4
5                          UNITED STATES DISTRICT COURT
6                       NORTHERN DISTRICT OF CALIFORNIA
7
8    ERICK JAY RICHARDSON,                    No. C 12-2853 SI (pr)
9                  Petitioner,                **ORDER DENYING PETITION FOR**
                                              **WRIT OF HABEAS CORPUS AND**
10        v.                                  **GRANTING CERTIFICATE OF**
                                              **APPEALABILITY**
11   M.D. BITER, warden,
12                 Respondent.
13   _____/
14                              **INTRODUCTION**
15        Erick Jay Richardson filed this *pro se* action seeking a writ of habeas corpus under 28
16   U.S.C. § 2254.  The matter is now before the court for consideration of the merits of the habeas
17   petition.  For the reasons discussed below, the petition will be denied.
18
19                              **BACKGROUND**
20        Procedural History
21        Richardson and his three co-defendants, Rowmond Brown, Delvond Brown and Robert
22   Rubio, were found guilty by a jury in a joint trial in Alameda County Superior Court of one
23   count of first degree murder, Cal. Penal Code § 187, of Thomas Anderson.  Richardson was
24   found to be a principal armed with a firearm and that he personally used a firearm.  Clerk's
25   Transcript ("CT") at 1659.  On July 20, 2007, Richardson was sentenced to state prison for 50
26   years to life.  *Id.*
27        Richardson appealed.  The California Court of Appeal affirmed the conviction and the
28   California Supreme Court  denied the petition for review.

Richardson then filed this action, seeking a writ of habeas corpus.  On July 19, 2012, this court issued an order to show cause on the claims that: (1) the prosecutor improperly excused several potential African-American jurors in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986); (2) Richardson's due process rights were violated by the erroneous admission of a prior murder on the issue of identity; (3) his due process rights were violated by the erroneous admission of eyewitness identification testimony that was the product of impermissibly suggestive photo lineups; (4) his due process rights were violated when the trial court refused to sever the trials or to exclude the co-defendants' statements from the joint trial; and (5) his due process rights were violated when the trial court refused to provide guidance to the mid-deliberation jury question regarding the application of the preponderance of the evidence standard.  Respondent filed an answer and Richardson filed a traverse.

The Crime

The following factual background is taken from the order of the California Court of Appeal:

A.  The Charged Murder of Thomas Anderson

Anderson's mother, Faye Anderson, testified that when she came home from work at 5:30 p.m. or 5:45 p.m. on the afternoon of September 2, 2003, Anderson was asleep.  He woke up and went outside, then came back about 10 minutes later to say he was going out with a friend for a while.  After he left, Ms. Anderson heard gunshots.  She went outside and saw Anderson lying in the street, mortally wounded.

On that afternoon, Anderson was hanging out with other people, including Antione Dickerson, at the corner of 48th Avenue and Vicksburg Avenue in Oakland.  According to Dickerson's testimony, a car came down 48th Avenue toward Vicksburg, turned right on Vicksburg, went to 50th Avenue, made a U-turn, and came back to the corner of 48th Avenue and Vicksburg. Dickerson's companions scattered, and Dickerson ran away. Shortly afterward, he heard gunshots.

Lashawnda Wills was driving on Vicksburg on the date in question, with her two young children.  Lashawnda saw Dickerson trying to make an African–American male with "dreads" or braids move over or push someone back.  A turquoise-green car passed her, then turned, came back, and collided with the left rear side of Lashawnda's car.  The turquoise car became hooked onto Lashawnda's car, and she could not move her car. Someone from the other car screamed, "Move, move."  Lashawnda saw four African–American men in the car.  She told them she could not move her car.  One of the passengers in the rear seat said, "Move, bitch.  Before I shoot your motherfucking ass," and pointed a gun at her.  She repeated that she could not move her car.  The other car

backed up, turned around, went down Vicksburg, and stopped at the area where Dickerson was standing.  Some of the occupants got out of the car, and Lashawnda saw someone leaning against a car.  Shortly afterward, Lashawnda heard shots.  She saw the person leaning against the car fall to the ground, and saw him being shot after he fell.

The person holding the gun had his hair in a "shortcut" or a "bald fade," and had acne on his face.  Other occupants of the turquoise car had dreads.  Lashawnda identified the gun as an Uzi.  She believed the driver of the turquoise car had dreads.  Lashawnda did not recognize any of the defendants in the courtroom.

Deanna Haley, who lived on Vicksburg, heard shouting in the area of Vicksburg and 48th Avenue at around 6:00 p.m. that day.  She looked toward 48th Avenue and saw three people, including Anderson and [Dickerson].  It appeared to her that there had been an argument and [Dickerson] had defused the situation.  A few minutes later, she heard more arguing, went to her front door, and saw Anderson being shot by two young African–American men she did not recognize, whom she described to a 911 operator as dark-skinned. FN8  One had dreadlocks, and was wearing a white T-shirt and blue jeans.  The other had short hair.  They continued to shoot Anderson as he lay on the ground.  She saw a turquoise car leave the area.  She saw five African–American males in the car.

FN8.  Haley testified at trial that she would not describe [co-defendant] Rubio as dark-skinned.  She also testified that she knew [co-defendant] Rowmond, and that he was not one of the shooters.

Another witness, Jessie Johnson, had seen a "greenish" car with several African–American occupants a few blocks away, driving recklessly in a zigzag manner up 48th Avenue.  About half an hour after the car passed, he heard gunshots.  He had told Sergeant Jeffrey Ferguson in October 2003, that when he was on 48th Avenue on the day in question, he saw a turquoise Oldsmobile driving in a zigzag pattern, that four African–American men in their early twenties were in the car, and that one of them looked like [co-defendant] Delvond Brown.  He told Ferguson he saw the car go down the hill toward Vicksburg, and that he heard an argument when the car was at the bottom of the hill.  He knew that Anderson and Dickerson were there, and that Dickerson's car was parked there.  He heard gunshots that sounded like they came from two different guns.  He ran to Vicksburg, and by the time he got there, Anderson was "leaking," and Deanna Haley was giving him CPR.  He did not see the turquoise car.

An autopsy showed that Anderson died of multiple bullet wounds.  Shell casings found at the scene were all .380 and .45 caliber.

B.  Jeffrey Bunn's Statements and Testimony About Anderson's Murder

Because the statements and testimony of Jeffrey Bunn are both confusing and relevant to some of the issues on appeal and in the related petition for writ of habeas corpus, we will discuss them separately.

Jeffrey Bunn testified at trial that he was nearby at the time in question, riding a "go-cart."  He went to a store with Anderson, then the two separated.  Anderson went to take a nap.   Bunn  heard  about  17 shots,  and  a  few  seconds  later  saw  three African–American males running to a turquoise green car on Vicksburg and 48th Avenue. FN9  He saw Anderson lying on the ground.  He identified [petitioner] as one of the people who ran to the car, an Uzi in his hand, to the front seat, and defendant Rubio as another person who ran to the car, a nine-millimeter gun in his hand, to the back seat on the driver's side. FN10  He identified defendant Rowmond Brown as the driver of the

3

turquoise car.  Another person, wearing a white T-shirt and blue jeans, ran to the car and got into the back seat on the passenger side.  Bunn identified that person as Delvond Brown, and said he had a gun.  Bunn initially testified that he had not seen any of them before that day; he later testified that his initial trial testimony had been a lie and that he knew and could describe all of the defendants because he had sold marijuana to them in the past.  FN11

FN9. Later in his testimony, he said that he had seen the three who shot Anderson getting out of the car, and that the driver never got out of the car.

FN10. He described Rubio as having bumps or acne on his face and crossed eyes.

FN11. He knew their nicknames: Rowmond Brown's nickname was Row; Delvond Brown's was Snail, [petitioner's] was E–Moe (sometimes spelled in the record as Emo); and Rubio's was Cross–Eyed Rob.  He said he had lied about knowing them because he was ashamed that he sold marijuana.

Bunn had made statements before trial, some of which were inconsistent with his trial testimony.  In a conversation with Sergeants Jeffrey Ferguson and Gus Galindo of the Oakland Police Department two weeks after Anderson was killed, Bunn said four people had been present when Anderson was killed.  He described two of them as having dreadlocks, one as having a "crooked eye" and bumps on his face, and the driver of the car as having short hair.  He identified [petitioner], Rubio, and Rowmond Brown from photographic lineups.  He was also shown a photographic lineup that included a picture of Delvond Brown, but did not identify anyone.  At trial, Bunn testified that he had told the officers, untruthfully, that he had seen someone get out of the car before the shooting.  He acknowledged being untruthful about "a whole bunch of stuff," and explained his lies by saying, "I just lost my mind."  He later testified that he had given the officers false information because he wanted to go home.

Bunn had also testified at the preliminary hearing.  There, he said that he saw all four defendants driving in the turquoise car and get out, carrying weapons.  Three of them approached Anderson.  Bunn heard arguing, then all four defendants shot Anderson.  Defendants then ran to the car and drove away.  At trial, he said he had lied at the preliminary hearing, and that he had testified at the preliminary hearing about things he had not seen himself, but that others had told him about.  In particular, he admitted at trial that he had testified falsely that he had seen all four defendants getting out of the car, that he had heard an argument before the shooting, and that he had seen four people shooting Anderson.

Bunn had also signed a declaration that was inconsistent with his trial testimony.  At trial, he testified that some time after the preliminary hearing, a friend told him that a lawyer wanted to talk to him, and said he would be given money if he talked with the lawyer.  He went to the home of David Kelvin, counsel for defendant Rubio.  According to Bunn, Kelvin told him that if he signed a document, he would not have to testify again.  To avoid testifying again, he signed the document.  Bunn had never spoken with Kelvin before that time, and the document had already been prepared for his signature when he arrived.  The document was a declaration stating that Bunn was not present at the time Anderson was killed, that his testimony at the preliminary hearing was untrue, and that he had testified to what Sergeant Ferguson had told him to say.

Bunn testified that the month before he testified at trial, he had been arrested for possession of cocaine, and that charges were pending against him.  He had been promised that his testimony at trial could not be used against him in a prosecution for perjury.  His

4

understanding was that he would not be prosecuted for any perjury he committed while testifying at trial.  FN13  He testified, however, that even if his grant of immunity did not cover perjury committed in front of the jury at trial, his testimony would not change.

FN13. He later changed his testimony to indicate he did not think he had immunity for committing perjury at trial.  He acknowledged however, that he had no concern whatsoever about lying under oath, and admitted having committed numerous acts of perjury during trial.

C. The Uncharged Killing of Michael Thompson

Earlier on the afternoon Anderson was killed, Michael Thompson was seated in a car driven by his friend, Milton Smith.  They stopped at a traffic light at Bancroft and 90th Avenue in Oakland.  Someone shot at them, striking both Thompson and Smith.  The car stopped in front of a nail salon, and the two men went inside.  Thompson collapsed on the floor, and Smith called for an ambulance.

Officer Michael Munoz of the Oakland Police Department received a call at about 4:50 p.m. and went to the nail salon.  The car parked outside had bullet holes.  Thompson was fading in and out of consciousness.  Munoz asked Thompson who had shot him, and Thompson told him "six male Blacks," and said they had dreadlocks.  He also described a Nissan station wagon.  Thompson died of his wounds.  Two bullets were recovered from his body.

An Oakland Police Department criminalist who testified as an expert in firearms examination and investigation concluded that certain of the bullets and casings from the scene of the Thompson killing were fired from the same guns as those from the scene of the Anderson killing.

D. Defendants' Statements

1.  Rowmond Brown
On the evening of November 5, 2003, after being arrested, Rowmond Brown was advised of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436) and was interviewed by Sergeants Ferguson and Galindo.  FN14  He acknowledged having driven in his turquoise car down 48th Avenue, zigzagging and showing off, then making a U-turn at 50th Avenue, and sideswiping a lady.

FN14.  As we will discuss in detail below, the statements of both Rowmond and Delvond Brown were redacted before the jury heard them. (See section II.B.1, *infra*.) This summary of their statements is drawn from the redacted versions heard by the jury.

In a taped statement made shortly after midnight on November 6, 2003, Rowmond was again advised of his *Miranda* rights.  He said he had seen Anderson earlier on the day he was killed, with [Dickerson] and some females.  He picked up his turquoise car from a detail shop around 4:00 p.m. or 5:00 p.m.  He went to 48th Avenue and Vicksburg to buy some marijuana, driving in a zigzag manner.  He made a U-turn, and hit a woman's car.  He heard multiple gunshots, and learned later in the day that Anderson had been killed.

. . .

Rowmond made another taped statement at approximately 11:30 a.m. the same morning.  In it, he acknowledged being in the rear of the Nissan station wagon when Thompson was

5

shot at 90th and Bancroft. He said [another friend] Kev was driving the car. He saw a burgundy car being shot at before driving away. He heard someone saying, "[T]here you go right there," and shots went off, but he did not know who said it. It could have been Kevin. He thought Kevin was shooting a gun, and he was pretty sure of that because "[i]t was two different shots." Afterwards, they went to a detail shop, got into Rowmond's car, and went to "four eight" to buy marijuana. He also said he did not know why the shooting happened, and that he did not want it to happen.

2. Delvond Brown
In the early morning hours of November 6, 2003, Delvond Brown was also advised of his *Miranda* rights. He said he had had twisties or dreads since 2000. He initially heard of the killing at 48th and Vicksburg when someone called the mother of his child, whom he was visiting, and said someone had been killed. As the interview progressed, however, Delvond said, "All right, I'll tell you." He continued, "It was not supposed to happen like that. I was just going to fight that guy." Delvond said that he saw Anderson among a crowd of people. Delvond had been in the back seat, and he "bounced out" at 48th Avenue and Vicksburg, ready to fight. He did not have a gun, and [Dickerson] stopped him from fighting Anderson. As [Dickerson] tried to break up the fight, Anderson said to [Dickerson], "Get that nigger off me. I ain't got my thang on me." Delvond was "mad as hell," but told the officers, "I'm a fighter, not a killer," and said what was done to Anderson was wrong. Delvond said he did not have a weapon. After leaving the intersection, he visited the mother of his child.

In a taped statement made at almost 5:00 a.m. on the same morning, Delvond was again advised of his *Miranda* rights. He said he was at 48th Avenue and Vicksburg on the day of Anderson's death. He was in a turquoise car owned by a friend of his. He saw [Dickerson] and Anderson. When he saw Anderson, he said, "There he go," and "bounced out ready to fight him." He was mad and wanted to fight Anderson. He tried to get to Anderson, and told [Dickerson] to get him away from [Dickerson's] car, because he knew there would be a fight and did not want to "mess up" [Dickerson's] car. [Dickerson] pulled Delvond away. Delvond denied having a gun with him. Anderson said, "[Dickerson] get that man off me. I ain't got my thang on me." "Thang" was a street term for gun. Delvond heard gunshots and took cover. He did not see who was shooting. He left and went to his "baby mama['s]" house.

. . .

At approximately 10:15 a.m. the same morning, Delvond gave another taped statement. He acknowledged having been present at the shooting of Thompson at 90th and Bancroft. Kev was driving a white Nissan Maxima wagon. Kev saw a burgundy car, and said something like, "[T]hat's them," or "[T]hat's that car." Kev followed the car and pulled up at a light. Delvond "[saw his] friend on the side of [him, and said] what's up to him." They got in the right-hand lane, pulled up, and "that's when the shit happened." Delvond did not recognize the car or its occupants. Delvond said Kevin, who was driving, did not do any shooting. Delvond saw guns. He recognized one as Kevin's. Someone—not identified in the redacted tape played to the jury—was shooting. Asked the source of the conflict with the occupants of the burgundy car, he said some people from West Oakland had come onto their turf and accused them of stealing rims from them. The occupants of Kevin's car then rode around and got rid of Kevin's car. Delvond also said that before going home, he "got dropped off, like I'm outta here, yo niggas is crazy."

3. [Petitioner]
[Petitioner] was also interviewed after being advised of his *Miranda* rights. He said he

had been wearing his hair in dreads for three years.  He acknowledged that he knew Kev. He said he bought marijuana on 48th Avenue, that he did not know the person who had been killed there, and that he had heard about the murder.

E.  Other Witnesses' Statements to Officers [and Trial Testimony]

Some of the trial witnesses had earlier given statements to police officers, some of which were more detailed than their trial testimony or contradicted their trial testimony.

The day after Anderson was killed, the primary investigator on the case, Sergeant Ferguson, and his partner, Sergeant Galindo, interviewed Dickerson.  Dickerson told them that on September 2, 2003, he had seen a turquoise car driving down 48th Avenue and turning right on Vicksburg.  There were at least four people in the car, and two young African–American "dudes" in the back seat were holding up guns.  The one on the driver's side in the back had a Mac–11.  He had a short "fade" haircut and brown skin. The person behind the passenger's seat had a handgun.  The passenger door opened when the car returned, and Dickerson saw the person holding the Mac–11 looking "hifee," a term meaning excited or "hyper."  FN15  He ran when he saw the back door open. He heard gunshots.

FN15.  At trial, Dickerson testified he could not recall how many people were in the car, did not recall seeing guns, did not know what the people in the car looked like, and was uncertain of their gender or race.

Ferguson interviewed Lashawnda Wills (the driver of the car struck by the turquoise car) on September 10, 2003.  Lashawnda had told him that the person who pointed a gun at her did not have gold teeth, and had no facial hair.  The driver had dreadlocks and gold teeth.  She told him the people who jumped out of the car had guns, and that she saw her cousin trying to restrain someone who was wearing a white T-shirt and blue jeans.

. . .

Ferguson interviewed Lawanda Wills[1] on September 12, 2003.  On a diagram, she marked where she lived, where she was standing when she saw Anderson being shot, and where the people who shot Anderson had come from before.

In a taped statement, Lawanda said that she had seen her cousin, Dickerson, near the corner of 48th and Vicksburg.  She saw one man walking toward Anderson, carrying a gun, and telling Dickerson to get Anderson away from his car.  The man had shoulder-length dreadlocks.  Dickerson tried to break up the confrontation, and a second person with dreadlocks "came out a nowhere" with a gun and started shooting Anderson. Anderson fell to the ground.  Lawanda ran to get a neighbor who knew CPR.  When she returned a minute later, the two men were gone.  She had seen the men on occasion in the past.

Ferguson showed Lawanda photographic lineups and asked if she could identify any of the people she had been talking about.  She pointed to Delvond Brown in one lineup as the person Dickerson had tried to stop and [petitioner] in another as having shot Anderson.

Lawanda had earlier told the officers who interviewed her that she was not present when

---

[1] She is the sister of Lashawnda Wills.

7

Anderson was killed; she told them she had lied because she was afraid of being killed herself. She testified repeatedly at trial that she remembered virtually nothing about the day Anderson was killed.

. . .

Sergeant Luis Cruz interviewed Nikita Ragan (who at the time gave her name as Sharonica Belton) on November 5, 2003. In a taped statement, she said she had known "Kev" for three or four months, that he used to drive a white station wagon, that he had sold it after Anderson was shot, and that she had seen his friend [Rubio] drive it. She had seen [Rowmond Brown], [Delvond Brown], and [petitioner] switching a gun among themselves, may have seen [Rubio] doing so, and had seen [Rowmond Brown] with a gun and had seen him hand a gun to somebody. [Rubio] had had a gun with a clip, which he was selling to someone "before summertime." [Rowmond Brown] used to have a turquoise car, but got rid of it; she believed he did so after Anderson was shot. FN18

FN18. Ragan testified at trial that she did not recall making these statements, and said she did not recall defendants passing guns around to one another, did not recall seeing Delvond Brown, Rowmond Brown, or [petitioner] with guns, did not recall Rubio trying to sell a gun with a clip in it, and did not recall Rowmond owning a turquoise-colored car or selling it.

*People v. Brown*, 2011 WL 1197465 *1-7 (Cal. App. 1 Dist. 2011).

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Alameda County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), ©. The parties do not dispute that the state judicial remedies were exhausted for the claims in the petition.

1

**STANDARD OF REVIEW**

2   This court may entertain a petition for writ of habeas corpus "in behalf of a person in

3   custody pursuant to the judgment of a State court only on the ground that he is in custody in

4   violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The

5   Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose

6   new restrictions on federal habeas review. A petition may not be granted with respect to any

7   claim that was adjudicated on the merits in state court unless the state court's adjudication of the

8   claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application

9   of, clearly established Federal law, as determined by the Supreme Court of the United States;

10  or (2) resulted in a decision that was based on an unreasonable determination of the facts in light

11  of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

12  "Under the 'contrary  to' clause, a federal habeas court may grant the writ if the state

13  court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

14  law or if the state court decides a case differently than [the] Court has on a set of materially

15  indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

16  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ

17  if the state court identifies the correct governing legal principle from [the] Court's decisions but

18  unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal

19  habeas court may not issue the writ simply because that court concludes in its independent

20  judgment that the relevant state-court decision applied clearly established federal law

21  erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A

22  federal habeas court making the "unreasonable application" inquiry should ask whether the state

23  court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

24

25

**DISCUSSION**

26  1.   *Batson* Claim

27  Richardson first argues that the prosecutor improperly excused several potential African-

28

9

1   American jurors.

2

3        Standard

4        The use of peremptory challenges by either the prosecution or defendant to exclude

5   cognizable groups from a jury may violate the Equal Protection Clause.  *See Georgia v.*

6   *McCollum*, 505 U.S. 42, 55-56 (1992).  The Supreme Court has held that the Equal Protection

7   Clause forbids the challenging of potential jurors solely on account of their race.  *See Batson v.*

8   *Kentucky*, 476 U.S. 79, 89 (1986).  *Batson* permits prompt rulings on objections to peremptory

9   challenges under a three-step process:

10        First, the defendant must make out a prima facie case that the prosecutor exercised

11   peremptory challenges on the basis of race "by showing that the totality of the relevant facts

12   gives rise to an inference of discriminatory purpose."  *Batson*, 476 U.S. at 93-94.

13        Second, if the requisite showing has been made, the burden shifts to the prosecutor to

14   articulate a race-neutral explanation for striking the jurors in question.  *Id*. at 97; *Wade v.*

15   *Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000).

16        Finally, the trial court must determine whether the defendant has carried his burden of

17   proving purposeful discrimination.  *Batson*, 476 U.S. at 98; *Wade*, 202 F.3d at 1195.  To fulfill

18   its duty, "the court must evaluate the prosecutor's proffered reasons and credibility under 'the

19   totality of the relevant facts', using all the available tools including its own observations and the

20   assistance of counsel."  *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004) (citation omitted);

21   *Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir. 2003).  "As part of its evaluation of the prosecutor's

22   reasoning, the court must conduct a comparative juror analysis . . .," particularly when the state

23   court declined to do so.  *Jamerson v. Runnels*, 713 F.3d 1218, 1224 (9th Cir. 2013).  Then the

24   court should "reevaluate the ultimate state decision in light of this comparative analysis and any

25   other evidence tending to show purposeful discrimination to decide whether the state was

26   unreasonable in finding the prosecutor's race-neutral justifications to be genuine."  *Id*. at 1225.

27        In evaluating the race neutrality explanation, the court must keep in mind that proof of

28

10

discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *See Hernandez v. New York*, 500 U.S. 352, 355-62 (1991) (no discriminatory intent where Latino jurors dismissed because of possible difficulty in accepting translator's rendition of Spanish language testimony).  It should also keep in mind that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility.  *See Rice v. Collins*, 546 U.S. 333, 340-41 (2006); *Lewis*, 321 F.3d at 830.  Because determinations of credibility and demeanor of the prosecutor and jurors lie "peculiarly within [the] trial judge's province," the trial court's ruling on the issue of discriminatory intent is entitled to great deference and must be sustained unless clearly erroneous.  *Snyder v. Louisiana*, 552 U.S. 472, 476-82 (2008) (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)); *see Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (per curiam) (reversing Ninth Circuit's "inexplicable" and "unexplained" finding that proffered race-neutral explanation  for peremptory strikes were insufficient to outweigh evidence of purposeful discrimination)

The findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review.  *See Purkett v. Elem*, 514 U.S. 765, 769 (1995).  So are the findings of the state appellate court.  *See Mitleider*, 391 F.3d at 1050; *Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004).


Analysis

The prosecutor, assistant district attorney Stein, used peremptory challenges against three potential African-American jurors (K.H., F.P. and A.C.)  which elicited *Batson* objections from the trial counsel.  Stein also used a peremptory challenge against C.D., but no objection was made.  The seated jury included three African-Americans.

The trial court held a hearing on the *Batson*/*Wheeler*[2] objections.  The trial court found that there was a reasonable inference that the prosecutor has used his challenges based on race and the burden shifted to the prosecutor to justify his challenges with race neutral reasons.  The

---

[2] The California counterpart to *Batson* is *People v. Wheeler*, 22 Cal. 3d 258 (1978).

prosecutor presented his reasoning and the trial court denied the *Batson/Wheeler* motion finding that the prosecutor has provided genuine and reasonable specific race-neutral reasons. Reporter's Transcript ("RT") at 834-94.

<u>Trial Court Proceedings</u>

<u>K.H.</u>

K.H., the prosecutor pointed out, had lived for the past 30 years in Berkeley, which he said many people consider "probably the most liberal city in the United States." K.H. was politically active in Berkeley, was a member of the Berkeley School Board, and had been a legislative aide for the City of Berkeley. She was also City Clerk and Assistant to the City Manager of the City of Emeryville. In response to a question about whether she had political aspirations, she had replied something to the effect of, "Never say never." The prosecutor did not believe someone who was involved in Berkeley politics and who might have further political aspirations was likely to be a "very good prosecution oriented juror." He was also concerned about K.H.'s membership in a number of organizations, including the National Women's Political Caucus; United In Action, which K.H. had characterized as an umbrella organization of "organizations that [ ] either represent communities of color or other groups that are interested in improving [education]," and the NAACP, which the prosecutor characterized as "actively tr[ying] to promote change and reform in the criminal justice system on behalf of its members and on behalf of people who are [ ] African–American."

. . .

Discussing the exclusion of K.H., the trial court noted that even if it were based only on her Berkeley residence, that would be a race-neutral reason. However, in addition K.H. was "intensely involved" in both Berkeley and Emeryville politics, which the court considered a race-neutral reason for exclusion. Moreover, she was a member of organizations whose positions generally supported those charged with crimes, also a race-neutral reason in the court's estimation.

*Brown*, 2011 WL 1197465 *8, 10.

<u>F.P.</u>

As to F.P., the prosecutor expressed two concerns. First, his brother was currently awaiting trial in a murder case. Second, he had founded a program dedicated to "getting kids off the street," and when some of the youths had been arrested, he had visited them in jail to support them.

. . .

As to F.P., the trial court noted that his brother was awaiting trial for murder, and concluded that this factor alone would justify excluding him. The court also agreed that while F.P.'s work coaching children and supporting those who went to jail was commendable, it might cause him to have sympathy and empathy with defendants.

*Brown*, 2011 WL 1197465 *9-10.

A.C.

A.C., the prosecutor noted, had worked in the past for the State Public Defender, and had answered telephone calls from defendants. She had worked for the Department of Fair Education and Housing, for the Department of Health Services, and as an adolescent group home counselor. The prosecutor acknowledged that this work was admirable, but said that in his experience, people who did that sort of work tended to feel sympathy for people charged with crimes. Moreover, A.C. had been arrested for purse snatching and placed on probation as a juvenile, and had on another occasion—which she did not mention in the jury questionnaire—been arrested by the Oakland Police Department and jailed. He did not believe she would be favorable to the prosecution.

. . .

As to A.C., the court noted that she had worked for the State Public Defender, which was dedicated to defending those charged with crimes, and with other agencies that worked with defendants, which the prosecutor could fear would lead her to have sympathy with defendants; this alone, in the court's view, would justify excluding her. Moreover, she had not only been arrested as a juvenile for purse snatching, but had also been arrested on another occasion—one she omitted from the jury questionnaire—by the Oakland Police Department, which had investigated the murder of Anderson and arrested defendants. The court found these reasons race neutral.

*Brown*, 2011 WL 1197465 *9-10.

C.D.

As to C.D., the prosecutor noted that she was 25 minutes late to court one morning, that she had her eyes closed or almost closed during most of the time the jurors were being questioned, that she did not consider her occupation as an airport security officer to be law enforcement, that her two sons had been arrested and prosecuted for criminal charges, that she had visited relatives in prison, and that she had at some point been a member of the NAACP, which the prosecutor characterized as an organization that was "sympathetic to people who are charged with criminal offenses and have been coming through the criminal justice system, a system that they are actively trying to reform."

. . .

Although C.D. was not the subject of a *Batson/Wheeler* motion, the trial court discussed her exclusion as part of the totality of the circumstances. The court noted that she was nearly half an hour late on the first morning, and offered no excuse. It also appeared to the court that she was dozing off throughout the jury selection process. Moreover, her two sons had been arrested and prosecuted for drug offenses in Alameda County, then went to state prison. She had also visited relatives in prison, including a former brother-in-law who had been jailed for robbery.

*Brown*, 2011 WL 1197465 *8-9.

After the prosecutor presented his race neutral reasons, trial counsels for the defendants responded and a brief comparative juror analysis occurred:

In response, defense counsel pointed out that a white juror, juror number 13, who had been engaged in outreach work had not been excused, and that another juror who had

13

been born in Berkeley had been seated on the jury without questions about her residency. The prosecutor responded that he had concerns about whether juror number 13 would be a favorable prosecution juror, but that she was an alternate.  Furthermore, at the time juror number 13 was seated there were only 18 potential jurors remaining on the panel, and defendants had 13 challenges remaining; the prosecutor was concerned that defense counsel might excuse any remaining jurors who were more favorably disposed toward the prosecution.  As to A.C., he noted that race was likely to be a factor in the case, and A.C.'s work for Fair Employment and Housing included limited investigations into whether discrimination had occurred, leading him to think she would be more sympathetic to the defense than to the prosecution.  As for the seated juror who had been born in Berkeley, her juror questionnaire indicated she had lived in Hayward for 30 years, distinguishing her from K.H., who was not only a resident of Berkeley but was politically active there.

. . .

The trial court also noted that the prosecutor had conducted similar voir dire for all jurors, that the jury as seated included three African–Americans, and that the prosecutor had three times "passed" his peremptory challenge when the jury contained three African–Americans.  The court also found the jurors to whom defense counsel had compared the excused jurors were not similarly situated.  The court concluded that the prosecutor was truthful about the reasons for exercising his peremptory challenges, and denied the *Batson*/*Wheeler* motions.

*Brown*, 2011 WL 1197465 *9-10.

Appellate Proceedings

The California Court of Appeal upheld the trial court's ruling and engaged in a comparative juror analysis while focusing on the third step of the *Batson* analysis and looking to the credibility of the prosecutor:

On appeal, we review the trial court's determination of this issue with great restraint, presuming that the prosecutor uses peremptory challenges in a constitutional manner and giving "'great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]'" (*Id.* at p. 571.)  If the trial court has made such an evaluation, its decision will be upheld on appeal if supported by substantial evidence. (*Ibid.*)  "But deference is not abdication: '"When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings.  But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient."' [Citations.]" (*People v. Gonzales* (2008) 165 Cal.App.4th 620, 628 (*Gonzales*).)  There can be no doubt that the trial court here made a sincere and reasoned effort to evaluate the prosecutor's proffered reasons for exercising his peremptory challenges.

The record supports the trial court's decision.  K.H.'s background, including her status as an elected member of Berkeley's school board, could reasonably lead the prosecutor to believe her views might not be favorable to the prosecution.  Defendants do not contend that residence in Berkeley, and involvement in the politics of that city, are a proxy for

14

race, and nothing we are aware of would support such an assumption.  (Compare *United States v. Bishop* (9th Cir. 1992) 959 F.2d 820, 822, 825–826, overruled on another ground in *United States v. Nevils* (9th Cir. 2010) 598 F.3d 1158, 1167 [improper to base challenge on juror's residence in city heavily populated by low-income African–Americans rather than on juror's own attitudes].)  The trial court could properly conclude the prosecutor's proffered race-neutral reasons for excusing K.H. were genuine.

We recognize that one of the reasons the prosecutor gave for excusing K.H. was her membership in the NAACP, among other organizations, a reason he had also given for excusing C.D., who had been a member of the NAACP for a short period in the 1970s.  FN20 The expressed basis for his concern, however—his belief that the NAACP actively tried to promote reform in the criminal justice system and that its members might not be favorably disposed toward the prosecution in a criminal case—was not inherently connected to the race of the prospective juror, and was not implausible.  FN21  (See *Gonzales*, *supra*, 165 Cal.App.4th at p. 628.)   Furthermore, the other reasons he proffered—that she was politically active in a liberal city, that she was a public official, and that she had not ruled out further political aspirations—were race neutral and plausible.

FN20.  The prosecutor's challenge of C.D. was not the subject of a *Batson/Wheeler* motion, although the trial court considered it as part of the totality of the circumstances.  Her lateness, inattentiveness in court, and the criminal record of at least three members of her family provided ample race-neutral justification for excusing her.

FN21.  The record does not disclose whether the prosecutor's understanding of the activities of the NAACP was correct.

The fact that the prosecutor did not challenge two other African–American jurors who were members of the NAACP does not change our view.  One of the two had worked in security management after retiring from the Navy, and was a member of a neighborhood watch group.   Although he had a son who had been briefly jailed 15 or 16 years previously, the prosecutor could reasonably have concluded from his background in the military, his work in security, and his involvement in neighborhood watch, that he was likely to be a favorable juror.  (See *People v. Gray* (2005) 37 Cal.4th 168, 190–191 [side-by-side comparison of excused jurors with those not excused shows clear reasons prosecutor might have preferred not to strike other jurors].)  The other juror who was a member of the NAACP was a nurse who had worked with trauma victims, and had seen a lot of violence in her career.  Asked her opinion of the criminal justice system, she stated that it was a "hard task," noted Oakland's high murder rate, and said that she thought the system treated people fairly.   The prosecutor could reasonably have concluded that her background as a whole did not suggest she would favor defendants.  Thus, a comparison of these jurors with K.H. and C.D. shows they are not similarly situated.  (See *People v. Lenix* (2008) 44 Cal.4th 602, 630–631 (*Lenix*).)

The trial court could similarly accept the prosecutor's expressed reasons for excusing F.P., whose brother was awaiting trial in a murder case.  "The arrest of a juror or a close relative is an accepted race-neutral reason for exclusion." (*Lomax*, supra, 49 Cal.4th at p. 573.)  Nor was it unreasonable for the trial court to accept at face value the prosecutor's expression of concern that F.P.'s work with young people who had been jailed might lead him to sympathize with defendants in a criminal case.  These reasons, too, were race neutral.

Defendants contend the prosecutor's concern with the fact that F.P.'s brother was awaiting for trial for murder was a sham, pointing out that the prosecutor did not challenge a white

15

juror who had checked the "yes" box to the question, "Have you or a close friend or relative ever been accused of, arrested for or prosecuted for a crime?" The questionnaire contained no elaboration of this answer, and the prosecutor did not ask the juror any questions about it. Assuming this omission was deliberate and not an oversight, this juror had worked as a police technician for years. As part of her responsibilities, she had worked in booking and as a dispatcher. This background as a whole might reasonably be seen to suggest the juror would be favorably disposed toward the prosecution. A comparison of this juror with F.P. shows they are not similarly situated, and there is no basis to conclude that the prosecutor's stated reasons for excusing F.P. were a sham.

A.C., as the prosecutor pointed out, had not only been placed on probation as a juvenile for purse snatching, but had neglected to mention on her jury questionnaire that on another occasion she had also been arrested by the Oakland Police Department and jailed. Her own experience with being arrested and incarcerated, including an arrest by the same police department that investigated the crimes in question here, was a race-neutral reason for exclusion that the court could reasonably accept. Likewise, the court could accept the prosecutor's explanation that he was concerned that A.C.'s work for the State Public Defender might indicate she would not be favorable to the prosecution.

. . .

Moreover, the jury as seated included three African–Americans. "'"[W]hile the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection."'" [Citations omitted]

Thus, we conclude the record contains substantial evidence to support the trial court's conclusion that defendants did not prove purposeful discrimination. (See *Lomax*, supra, 49 Cal.4th at p. 571.) for exercising his peremptory challenges, and denied the *Batson/Wheeler* motions.

*Brown*, 2011 WL 1197465 *11-13.


Discussion

In this case, both the trial court and the California Court of Appeal reached the third *Batson* step and discussed the prosecution's reasons for striking these jurors and engaged in a comparative juror analysis. After reviewing the Court of Appeal opinion, the trial court decision and the entire record, it is clear that the prosecutor's reasons for dismissing these jurors were quite reasonable and race-neutral.

F.P.'s brother was awaiting trial for murder, the same charge in this underlying case. While it occurred in Sacramento County, F.P. indicated he is close with his brother and has a very good relationship with him. RT at 381. C.D.'s two sons had been arrested and prosecuted

16

for drug offenses in Alameda County, the same county as the instant crime, then went to state prison and she had a former brother-in-law who had been jailed for robbery.  In addition to A.C.'s placement on probation as a juvenile for purse snatching, she had been arrested and jailed by the Oakland Police Department, the same department that investigated the current crime, for allegedly assaulting someone else, but was not charged.  RT at 617.

These incidents alone were sufficient race-neutral reasons to excuse these jurors.  That a potential juror has a relative who has been convicted of a crime or another prior negative experience with law enforcement are race-neutral reason for striking a juror.  *See, e.g. Cook v. LaMarque*, 593 F.3d 810, 820–21 (9th Cir. 2010) (prior negative experiences with law enforcement sufficient race-neutral explanation to withstand *Batson* challenge); *Mitleider v. Hall*, 391 F.3d 1039, 1048 (9th Cir. 2004) (brother's conviction for cocaine possession was a facially neutral reason for challenging juror); *United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir. 1987) ("reasonable" to challenge black juror whose brother was in prison for armed robbery), overruled on other grounds by *Huddleston v. United States*, 485 U.S. 681 (1988); *Messiah v. Duncan*, 435 F.3d 186, 201 (2d Cir. 2006) (prosecutor could reasonably have believed that juror who had been prosecuted by his office and who had relatives in prison would be unduly sympathetic to defendant and hostile to the prosecutor); *United States v. Crawford*, 413 F.3d 873, 875 (8th Cir. 2005) ("There is no *Batson* violation when a juror is dismissed because the juror's relatives have been prosecuted or convicted of a crime.").

There were also other race-neutral reasons for excusing these jurors.  F.P. had been working with youths in Oakland for ten years, and after some had become involved with law enforcement,  F.P. visited them in jail.  RT at 378-79.  It was reasonable for the prosecutor to conclude that F.P. could be sympathetic with the defendants, who were in their late teens or early twenties.  A.C. had also worked for the state public defender, speaking with criminal defendants.  As the public defender organizations and prosecuting agencies are often at odds with each other, A.C. could have had pre-existing beliefs regarding either the prosecution or the defense.  She had also worked at an adolescent group home.  As noted by the prosecutor and trial court, C.D.

1   appeared to be sleeping during voir dire:

2       THE COURT:   Mr. Stein [the prosecutor] noted that [C.D.'s] eyes were closed
        throughout most of the voir dire.  Mr. Stein stopped short of concluding that she was
3       sleeping.  I'm not sure I'd stop so short.  [C.D.] was obviously dozing off throughout the
        jury selection process.  On a number of occasions I debated here on the bench whether
4       I should stop the proceedings in some fashion, declare a recess, drop books on the
        ground, do something that might either awaken [C.D.] or give her the opportunity to
5       stretch.

6   RT at 881.  The use of a peremptory challenge against the drowsy C.D. was justified and race-

7   neutral, considering the complexity of the four-defendant murder trial to come.

8       The prosecutor also offered several reasonable race-neutral reasons for excusing K.H.

9   Despite Richardson's assertions to the contrary, K.H.'s political employment and political

10  participation and thirty year residency in Berkeley, which the prosecutor described as a very

11  liberal city, were race-neutral reasons to dismiss her.  She was also a member of organizations

12  which the prosecutor believed generally supported those charged with crimes.  One of the

13  organizations was the NAACP, but prosecutor's challenge related to the NAACP's support for

14  criminal defendants rather than its race-specific positions.  Here the prosecutor excused juror

15  K.H. for several reasons; that one of those reasons was membership in the NAACP does not

16  alone demonstrate a *Batson* violation.  *See United States v. Payne*, 962 F.2d 1228, 1233 (6th Cir.

17  1992), cert. den., 506 U.S. 1033 (1992) (upholding peremptory strike of juror on basis that he

18  was a member of the NAACP).

19      Richardson also argues that the prosecutor's stated race-neutral reasons for dismissing

20  several of the jurors were false, on the basis of a comparative analysis.  However, as both the

21  trial court and the Court of Appeal noted, the other un-challenged jurors were different in

22  various ways.  With respect to K.H. and her Berkeley residency, Richardson argues that juror

23  number one,  a white female,  had resided in Berkeley but was not questioned by the prosecutor

24  regarding her residency.  However,  juror one was born in Berkeley but had lived in Hayward

25  for the past thirty years and attended high school in San Lorenzo.  Exh. A at 4415, 17.  Thus, it

26  is not clear how long she lived in Berkeley in her youth.  Another vital difference between juror

27  one and K.H., was that juror one's son currently worked as a correctional officer or jailer for the

28

San Leandro Police Department and had previously worked at an Oakland jail for three to four years.  RT at 396, 98-99; Exh. A at 4416, 21.  It is not surprising that the prosecutor would want a juror whose son had several years experience working at county jails.

Richardson argues that juror thirteen, who was white,  had engaged in outreach work in the community but was seated as an alternate juror, while F.P. was dismissed in part due to his work with youths in Oakland, and A.C. was dismissed in part for her work with several governmental organizations, such as the state public defender, the Department of Fair Education and Housing, and an adolescent group home.  However, juror thirteen's community outreach work was quite different from that of F.P. and A.C.  At the time of voir dire, juror thirteen worked in San Francisco as a health care policy research analyst at UCSF.  Exh. A at 4619.  She worked on several projects looking at health care systems with insurance companies and pharmaceutical companies, health care reform issues and medical school diversity and people applying to medical school.  RT at 824, 827.  Her prior outreach work at a community health clinic involved assisting with completing medical and insurance applications and doing dental and vision screening for kids.  RT at 824.  Juror thirteen's work was distinguishable as she was not working in an adolescent group home or public defender's office and was not visiting youths who has been jailed.

As the Court of Appeals' opinion noted, another white juror answered yes to the question on the questionnaire concerning if she, a close friend or relative had been accused, arrested or prosecuted for a crime, but the questionnaire did not elaborate nor did the prosecutor ask her any questions regarding the answer.  That the prosecutor did not excuse this juror or ask her questions fails to demonstrate any racial discrimination.  This juror was clearly different from F.P., whose brother was awaiting trial for murder, as this juror had been working as a police technician for years and worked in booking and as a dispatcher.  It would be reasonable for the prosecutor to want a juror who worked for the police department.

Finally, that the prosecutor did not excuse two other African-American jurors who were members of the NAACP, fails to demonstrate a *Batson* violation.  That the prosecutor did not

excuse these jurors shows that he did not use membership in the NAACP as a pretext to excuse African-American jurors.  Rather, the NAACP members who were dismissed were excused because of the many factors stated by the prosecutor.  One of the two NAACP jury members had worked in security management after retiring from the Navy and was a member of a neighborhood watch group.  The other juror was a nurse who had worked with trauma victims, and had seen a lot of violence in her twenty-four year career at an Oakland hospital.  RT at 326-27.  She also stated that Oakland has the fourth highest murder rate in the nation and when asked if she thought the system treats people fairly, she responded, "mostly, yes."  RT at 328.  It was reasonable for the prosecutor to believe these jurors would be beneficial to his case based on several factors, which reenforces the trial court and appellate court decisions finding that the prosecutor did not excuse the other jurors who were NAACP members due to their race.

After reviewing the trial records, it appears that the trial court and appellate court findings of fact were accurate and entitled to the presumption of correctness.   The prosecutor's race-neutral reasons for excusing these jurors were reasonable and the Court finds no indication of purposeful discrimination, especially as three of the selected jurors were African-American.  A comparative juror analysis discredits many of Richardson's arguments, and further reenforces that the peremptory challenges were race-neutral.  For all these reasons, Richardson has failed to demonstrate a *Batson* violation and this claim is denied.

2. <u>Admission of Evidence</u>

Richardson next argues that his due process rights were violated by the erroneous admission of evidence about a prior murder, received on the issue of identity.

<u>Standard</u>

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021,

1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)).

Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *See Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. *See id.* (citing *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983)). The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990.

Even if an evidentiary error is of constitutional dimension, the court must consider whether the error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001). A habeas petitioner is not entitled to relief unless the trial error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice."

Whether a trial error had a substantial and injurious effect is not to be analyzed in terms of burdens of proof. *O'Neal v. McAninch*, 513 U.S. 432, 436-37 (1995). Instead, the proper

question in assessing harm in a habeas case is, "'Do I, the judge, think that the error substantially influenced the jury's decision?'" *Id*. If the court is convinced that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand. *Id*. at 437. If, on the other hand, the court is not fairly assured that there was no effect on the verdict, it must reverse. *Id*. In the "narrow circumstance" in which the court is in "grave doubt" about whether the error had substantial and injurious effect or influence in determining the jury's verdict, it must assume that the error is not harmless and the petitioner must win. *Id*. at 436, 438.

A federal habeas court reviewing the prejudicial effect of constitutional trial error does not simply examine whether there was sufficient evidence to support the conviction in the absence of constitutional error. Rather, regardless of whether there is sufficient evidence to support the conviction apart from the error, the court must determine whether the error had a substantial and injurious effect or influence on the conviction. If it did, the court must set aside the conviction. *Ghent v. Woodford*, 279 F.3d 1121, 1127 (9th Cir. 2002) (finding prejudice under *Brecht* from admission of evidence obtained in violation of *Miranda* after examining effect of erroneously admitted evidence only on disputed issue of petitioner's mental state, not on undisputed question of whether petitioner actually committed crimes). This does not mean, however, that the court cannot review all the state's evidence to determine whether the error had a substantial and injurious effect on the jury's verdict. *Sims v. Brown*, 425 F.3d 560, 570-71 (9th Cir.), amended, 430 F.3d 1220 (9th Cir. 2005).

Analysis

The California Court of Appeal discussed the background information regarding the uncharged shooting that led to the death of Michael Thompson:

> Earlier on the afternoon [Thomas] Anderson was killed, Michael Thompson was seated in a car driven by his friend, Milton Smith. They stopped at a traffic light at Bancroft and 90th Avenue in Oakland. Someone shot at them, striking both Thompson and Smith. The car stopped in front of a nail salon, and the two men went inside. Thompson collapsed on the floor, and Smith called for an ambulance.

> Officer Michael Munoz of the Oakland Police Department received a call at about 4:50 p.m. and went to the nail salon. The car parked outside had bullet holes. Thompson was

fading in and out of consciousness. Munoz asked Thompson who had shot him, and Thompson told him "six male Blacks," and said they had dreadlocks. He also described a Nissan station wagon. Thompson died of his wounds. Two bullets were recovered from his body.

An Oakland Police Department criminalist who testified as an expert in firearms examination and investigation concluded that certain of the bullets and casings from the scene of the Thompson killing were fired from the same guns as those from the scene of the Anderson killing.

*Brown*, 2011 WL 1197465 *4.

Richardson and his co-defendants argued that the trial court abused its discretion in the admission of evidence of the uncharged killing of Michael Thompson. On appeal the California Court of Appeal held that there was no error and the evidence was properly admitted against two of Richardson's co-defendants,[3] however the court held it was an error to admit the evidence against Richardson and co-defendant Rubio:

We reach a different conclusion as to the admission of the other crimes evidence against Richardson and Rubio. The Attorney General concedes the evidence of the shooting [of Michael Thompson] should not have been admitted against them because there was no evidence before the jury to tie them to that shooting, and we agree. (*See People v. Poulin* (1972) 27 Cal.App.3d 54, 65 ["the collateral offense cannot be put in evidence without proof that the accused was involved in its commission"].) We conclude, however, that the error was harmless. FN26 The jury was instructed pursuant to CALJIC No. 2.50.1 that it could not consider the evidence of the other crime "for any purpose, unless you find by a preponderance of the evidence that a defendant committed [that] crime." As there was no evidence before the jury that either Rubio or Richardson was involved in the shooting at 90th Avenue, FN27 there is no basis to conclude it would have considered the evidence of that crime against them.

FN26. We would reach this result under either the standard for federal constitutional violations (*Chapman v. California* (1967) 386 U.S. 18, 24) or the more lenient state standard (*People v. Watson* (1956) 46 Cal.2d 818, 836).

FN27. Indeed, it appears that Thompson's description of his attackers as having dreads excludes Rubio, who seems to have been the shooter at the Anderson killing with a short haircut.

Richardson and Rubio argue, however, that as instructed, the jury could have believed it could consider the evidence of the 90th Avenue shooting against Rubio and Richardson if it found by a preponderance of the evidence that "a defendant"—including Rowmond or Delvond Brown—had committed it. The Attorney General acknowledges that this instruction as given "could have been better worded." However, we see no likelihood that in fact a jury would have

---

[3] The two co-defendants, Rowmond and Delvod Brown, admitted to being at the scenes of both shootings and evidence showed that the same guns were used at both shootings.

23

concluded it could use the evidence of the shooting at 90th Avenue against Rubio and Richardson in the absence of evidence that they participated in that crime.

We recognize that during deliberations, the jury sought clarification of the law regarding uncharged offenses, asking the court to "explain in layman's terms" the definition of "evidence of other crimes by a defendant proved by a preponderance of evidence." The court drew the jury's attention to the printed instructions on other crimes evidence (CALJIC Nos. 2.50, 2.50.1), and the instructions on the definition of preponderance of the evidence and proof beyond a reasonable doubt (CALJIC Nos. 2.50.2 & 2.90), and declined to amplify on them further. The foreperson asked, "Since you can't describe in layman's terms, could you give an example of preponderance of the evidence?" The court said, "No, I can't," and the foreperson said, apparently to the other members of the jury, "I tried." This exchange suggests that the jury may have been confused about the meaning of preponderance of the evidence, but it does not suggest the jury was struggling with whether to consider the uncharged [Michael Thompson] shooting against Rubio and Richardson, where no admissible evidence showed they had been present there.

*Brown*, 2011 WL 1197465 *28 (footnotes omitted).

The state court found that the admission of evidence was an error, but that the error was harmless under *Chapman v. California*, 386 U.S. 18, 24 (1967). This court must assess the prejudicial impact of a constitutional error in a state-court criminal trial under the *Brecht* standard, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the *Chapman* standard. *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).

While it was an error for the evidence to be admitted against Richardson, the error was not egregious enough to warrant relief under *Brecht*. Co-defendant Rowmond Brown made a statement that he was in a car when someone else in the car shot Michael Thompson. RT at 4437-39; CT, Vol. 32 (Trial Exh. 109A at 4-5). He also admitted that he was at the scene of the crime when Thomas Anderson was killed and was driving the turquoise car that had previously struck Lashawnda Wills's car. RT 3510-15; CT, Vol 28 (Trial Exh. 76A at 8-10). The audio of these statements was played to the jury and a transcript was provided. Co-defendant Delvond Brown admitted that he was in the turquoise car and exited the car to go fight Thomas Anderson, but denied having a gun. RT at 3542; CT, Vol 29 (Trial Exh. 80A). He also stated he was in the car when someone else shot Michael Thompson, but he did not fire a gun. RT at 4415-17; CT, Vol 31 (Trial Exh. 105A at 5-10). An audio of his statements was played to the jury and a transcript was provided.

1    While all of this evidence connected Rowmond and Delvond Brown to the Michael

2  Thompson shooting, there was little evidence of Richardson being involved with the Michael

3  Thompson shooting. The statements from Rowmond and Delvond Brown placed Richardson

4  at the scene of both crimes and as one of the shooters of Michael Thompson, but all of this

5  evidence was altered and redacted before being presented to the jury, as described in more detail

6  in claim four below.[4]

7    In closing arguments, Richardson's trial counsel stated the following:

8    Well, what evidence is there that Erick Richardson is responsible for the murder of
     Michael Thompson? Well, all you have heard ladies and gentlemen is a white Nissan
9    was involved and Michael Thompson told an officer that there were six black males with
     dreads. And that is it. There might be one other evidence, I think in Mr. Erick
10   Richardson's statement to the police. He says that he knows a Kev. Well, Kev is the
     person that owns this Nissan. Well, that is the evidence with regard to connecting Mr.
11   Erick Richardson to that crime. I suggest to you, that is not enough to say by a
     preponderance of the evidence. That is not enough to conclude by a preponderance of
12   the evidence that Mr. Erick Richardson is responsible for that murder.

13  RT at 6174.

14    As described in the state court opinion, the jury was given an instruction that they could

15  not consider the evidence of the other crime unless they found by a preponderance of the

16  evidence that a defendant committed the crime, and there was little to no evidence that

17  Richardson was involved. Juries are presumed to follow a court's limiting instructions with

18  respect to the purposes for which evidence is admitted. *Aguilar v. Alexander*, 125 F.3d 815, 820

19  (9th Cir. 1997). While the jury did have a question regarding the preponderance of the evidence

20  standard, there is no indication that it involved Richardson, considering the extensive evidence

21  regarding two of his co-defendants and the Michael Thompson murder, and given the lack of any

22  evidence connecting Richardson to that crime. Richardson simply asserts that because of the

23  evidence against the two co-defendants, the jury must have felt that he too was connected to the

24

25

26

27    [4] As noted in the discussion of claim four, the statements were altered so even the use
28  of plurals was removed.

25

1    Michael Thompson murder and therefore found him guilty of the Thomas Anderson murder.[5]

2    However, Richardson is unable to support this contention.

3         The issue before this Court is whether the admission of the evidence "'had substantial and

4    injurious effect or influence in determining the jury's verdict.'"  *See Brecht*, at 637.  While the

5    admission of the evidence was an error, this Court is not convinced that the error substantially

6    influenced the jury's decision regarding Richardson.  While there may be some doubt about the

7    effect the admitted evidence had on Richardson, this Court does not have the "grave doubt"

8    about this issue required to provide habeas relief under the standard of *Brecht*.  The erroneously

9    admitted evidence concerned the uncharged murder of Michael Thompson, not the charged

10   crime in the underlying case, and lacked evidentiary connection to Richardson.  A conclusion

11   that such evidence substantially and injuriously affected the jury's verdict, in violation of the

12   limiting jury instructions, is too attenuated and unlikely to warrant habeas relief.  While the

13   sufficiency of the evidence is not determinative of this claim, the Court notes that several

14   witnesses, albeit contradicted by other testimony, placed Richardson at the scene of the charged

15   murder of Thomas Anderson and identified him as Anderson's shooter.  Richardson has failed

16   to demonstrate a constitutional violation severe enough to warrant relief and this claim is denied.

17

18   3.    Eyewitness Identification

19        Richardson next argues that his due process rights were violated by the erroneous

20   admission of eyewitness identification testimony which was the product of impermissibly

21   suggestive photo lineups.

22

23        Standard

24   "A conviction which rests on a mistaken identification is a gross miscarriage of justice."

25   *Stovall v. Denno*, 388 U.S. 293, 297 (1967).  Thus, the Constitution "protects a defendant against

26

27        [5] While in closing arguments the prosecutor did argue that Richardson was present at the Michael
     Thompson murder, he did not support the assertion with any evidence other than there were several
28   African-Americans in a car with dreadlocks.  RT at 6053.

a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry v. New Hampshire*, 132 S. Ct. 716, 723 (2012).

Due process requires suppression of eyewitness identification evidence "when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Id.* at 718; *see Manson v. Brathwaite*, 432 U.S. 98, 107-09 (1977); *Neil v. Biggers*, 409 U.S. 188, 196-98 (1972). The purpose of this rule is "to deter police from rigging identification procedures." *Perry*, 132 S. Ct. at 721.

Admission of identification testimony amounts to a violation of due process only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure. *See Van Pilon v. Reed*, 799 F.2d 1332, 1338 (9th Cir. 1986). A reviewing court may assume suggestiveness and review reliability first. *See id.* at 1339.

An identification procedure is impermissibly suggestive when it emphasizes the focus upon a single individual, thereby increasing the likelihood of misidentification. *See Bagley*, 772 F.2d 482, 493 (9th Cir. 1985); *see, e.g.*, *United States v. Burdeau*, 168 F.3d 352, 357-58 (9th Cir. 1999) (finding that photo placement, hue and facial expression were insubstantial differences between defendant's photograph and the others in a photographic array and did not create an impermissible suggestion that defendant was the offender); *United States v. Montgomery*, 150 F.3d 983, 992-93 (9th Cir. 1998) (showing witness photographs of defendant, giving witness own copy of photograph of defendant and allowing witness to view defendant in courtroom day before witness testified found suggestive).

Analysis

The Court of Appeal rejected the claim that the photo line-ups were unduly suggestive:

Richardson contends the trial court should have suppressed Bunn's and Lawanda Wills's identifications of him because they were based on unduly suggestive photo spreads.

In a hearing on Richardson's motion to suppress the identifications, Sergeant Ferguson testified that when he interviewed Lawanda Wills ten days after Anderson was killed, she described one of the gunmen as being "male, black, 23, 24, six foot one, thin, dark complexion, had dreadlocks." Ferguson prepared a photographic lineup that included Richardson's photograph and five other "filler photos." Lawanda identified Richardson from the lineup. Ferguson interviewed Bunn a few days later. Bunn described one of the killers as "male, black, 20 to 21, 5[-]9, 5–10, dark complexion, ... skinny. No facial hair. Long skinny dreadlocks almost to his shoulders." Bunn identified Richardson from a photographic lineup as the gunman who had an Uzi.

Richardson argued the photographic lineups were unduly suggestive. According to his counsel, in the lineup Lawanda was shown, Richardson was the only person who had dreadlocks, while the others had braids, and in the lineup Bunn was shown, only one other person—who was not "skinny"—had dreadlocks, while Richardson was the only person with "long skinny dreads."

The trial court denied Richardson's motion to suppress, finding the photographic lineups did not give rise to a very substantial likelihood of irreparable misidentification. The court concluded the photographic lineup shown to Lawanda was "very fair," that one of the other people in the lineup bore a remarkable resemblance to Richardson in terms of length of hair, complexion, and facial features, and that the others were not dissimilar: their hair was similar, although there were differences in hairstyles, and their complexions and weight were similar to Richardson's. Similarly, the court found Richardson's photograph did not stand out in the photographic lineup shown to Bunn, noting that three of the people in the filler photos looked remarkably like Richardson, with similar facial features and complexion, that one of them had a virtually identical hairstyle (and another was the person who in the lineup shown to Wills had similar hair length), and that the other two in the lineup were also similar to Richardson, although their braids or dreadlocks were shorter than Richardson's. The court concluded that the photographic lineups were "among the best[,] among the most representative, the least suggestive, the least likely to give rise to a substantial likelihood of irreparable misidentification" it had seen.

. . .

We have reviewed the photographic lineups, and we agree with the trial court that they are not "so impermissibly suggestive that [they gave] rise to a very substantial likelihood of irreparable misidentification." (*Carlos*, *supra*, 138 Cal.App.4th at p. 912.) We recognize that Lawanda and Bunn both identified the gunman in question as having dreadlocks, and that some of the others in the lineups appear to have braids, rather than dreadlocks. However, viewing the totality of the circumstances, it appears that the people in the other photographs were similar enough to Richardson in appearance that the lineups were not impermissibly suggestive.

*Brown*, 2011 WL 1197465 *30-31.

Richardson only argues that his picture showed him with a dreads hairstyle while the other pictures had men with a braids hairstyle, therefore the line-ups were unduly suggestive. While there were differences in hairstyles and complexions, the trial court found that the photo line-ups were quite fair and both line-ups contained pictures of other men very similar to

28

1    Richardson.  The trial court also noted that one other picture had a man with virtually identical

2    hair and another picture had similar hair.  The Court of Appeal also reviewed the photo line-ups

3    and reached a similar conclusion noting the similarities between the pictures despite some of the

4    photos containing what appeared to be braids rather than dreads.[6]

5         In this petition, Richardson only discusses the differences between the hairstyles of the

6    other pictures but fails to address the trial court and appellate court decisions which found many

7    of the photographs quite similar to him including the hair.  Unsupported and "conclusory

8    allegations which are not supported by a statement of specific facts do not warrant habeas relief."

9    *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).  Richardson has failed to show that the photo line-

10   up was suggestive or that the state court decision was an unreasonable application of Supreme

11   Court authority.  This claim is denied.

12

13   4.    Motion to Sever and Excluded Statements

14        Richardson argues that his due process rights were violated when the trial court refused

15   to sever the trials or to exclude the co-defendants' statements from the joint trial.

16

17        Standard

18        A joinder, or denial of severance, of co-defendants or counts can prejudice a defendant

19   sufficiently to render his trial fundamentally unfair in violation of due process.  *Grisby v.*

20   *Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997).  A federal court reviewing a state conviction under

21   28 U.S.C. § 2254 does not concern itself with state law governing severance or joinder in state

22   trials.  *Grisby*, 130 F.3d at 370.  Its inquiry is limited to the petitioner's right to a fair trial under

23   the United States Constitution.  *Id*.  To prevail, therefore, the petitioner must demonstrate that

24   the state court's joinder or denial of his severance motion resulted in prejudice great enough to

25   render his trial fundamentally unfair.  *Id*.  In addition, the impermissible joinder must have had

26   _____

27        [6] This court has viewed the photo line-ups and agrees with the conclusions of the state courts.
     Docket No. 17.  Both line-ups contain pictures of other individuals who were quite similar to Richardson
28   and the line-ups were not impermissibly suggestive.

1    a substantial and injurious effect or influence in determining the jury's verdict.  *Sandoval v.*
2    *Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).

3         A defendant is deprived of his Sixth Amendment right of confrontation when a facially
4    incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if
5    the jury is instructed to consider the confession only against the codefendant.  *See Bruton v.*
6    *United States*, 391 U.S. 123, 126, 135-36 (1968).  Where the codefendant's confession does not
7    on its face incriminate the defendant, but rather will only incriminate the defendant if "linked"
8    with other evidence introduced  at trial, and the confession is redacted to eliminate not only the
9    defendant's name, but any reference to the defendant's existence, the Confrontation Clause is not
10   violated by admission of the confession with a proper limiting instruction to the jury.
11   *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

12

13       Analysis

14       The jury heard recordings of, and viewed the transcripts of, statements made by co-
15   defendants Delvond and Rowmond Brown.  The statements were redacted and altered, and the
16   jury was instructed that these statements should be considered only as to the defendant making
17   the statement.  The un-redacted statements placed Richardson with the Browns at both crimes,
18   and as one of the shooters of Michael Thompson.  However, references to Richardson and most
19   references to "you guys" or other plural words, were altered, although a few references to "guys"
20   were not deleted.  Non-defendant "Kevin," who was implicated in the Michael Thompson
21   murder, was repeatedly referenced in the statements.  Richardson argues that despite the
22   redactions and alterations, the statements indicate that someone other than declarants and non-
23   defendant Kevin was present during the shootings.  The California Court of Appeal denied this
24   claim:

25       [Co-defendant] Rubio and Richardson asked to be tried separately from Delvond and
         Rowmond Brown, arguing that admission of the Brown brothers' statements, even
26       redacted, would violate their right to confrontation and would prejudice them.  As they
         point out—and as we have discussed—while the redacted statements do not mention
27       Rubio and Richardson by name, both Delvond's and Rowmond's statements indicate that
         someone other than the declarant and (in the case of the Thompson killing) Kevin was
28

present during the shootings.  The redacted statements do not, however, mention the number of other people in the vehicle at the time of either shooting.

The United States Supreme Court in *Richardson*, *supra*, 481 U.S. at p. 211, held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when ... the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."  The court left open, however, the question of "the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun."  (*Ibid.*, fn.5.)

. . .

. . . . Richardson and Rubio argue that a nexus between the Brown brothers and themselves was drawn by the evidence of the friendship among the four codefendants. Richardson and Rubio do not point to any evidence, however, that defendants associated exclusively with each other.  Nor do the redacted statements provide any other identifying information about the other occupants of the car to suggest they included Rubio or Richardson.  The evidence of their friendship was not specific enough for us to conclude that the statement as redacted referred directly to Rubio and Richardson and facially incriminated them.

Moreover, though it appears from Delvond and Rowmond Brown's statements that the respective declarants (and in the case of the Thompson killing, Kevin) were not the only persons in the vehicles, the statements were not redacted in a manner that would alert the jury that a specific name had been deleted.  [Citation omitted].  As the United States Supreme Court indicated in *Gray v. Maryland* (1998) 523 U.S. 185, 196, there is a distinction between the following two redactions to the answer to the question: "'Who was in the group that beat Stacey?'" (1) "'Me, deleted, deleted, and a few other guys,'" and (2) "'Me and a few other guys.'"  The redactions here fall in the "'Me and a few other guys'" category.  In the circumstances, we see no abuse of discretion in admitting the redacted statements at a joint trial.

*Brown*, 2011 WL 1197465 *22-24.

Here, Richardson cannot show that the trial court's decision against severing his case from that of the co-defendants either deprived him of his right to a fair trial or violated his right to confront the witnesses against him.  The mere fact that evidence was introduced regarding the other defendants and in a few occasions may have referenced that others were with them, did not constitute a due process violation. *See United States v. Matta–Ballesteros*, 71 F.3d 754, 770–71 (9th Cir. 1995) (upholding trial court's denial of defendant's motion for severance from co-defendants, even though evidence was introduced at trial involving three homicides and marijuana enterprise with which defendant was not involved); *United States v. Escalante*, 637 F.2d 1197, 1201–02 (9th Cir. 1980) (upholding denial of severance, even though evidence relating to co-defendant's connection to organized crime and participation in murder was

admitted).

Other than generally arguing that the altered and redacted statements referenced other people being with the co-defendants, Richardson does not cite to specific parts of the statements or records or provide much support for his argument. Richardson concludes that because he was friends with the other co-defendants, the jury would assume that he was being referenced in the statements. This conclusory argument is insufficient to warrant habeas relief.

The court has reviewed the redacted statements provided to the jury from both co-defendants. CT, Vol. 28-32 (Trial Exhs. 76A, 80A, 102A, 105A, 109A). The court has also reviewed the un-redacted statements which indicate what passages and words were excised. CT, Vol. 33. The court did not observe any aspect of the redacted statements that prejudiced Richardson, since all references to him were redacted and there were no vague allusions to him. Other non-defendants were mentioned in the statements, so there was no prejudice resulting from mention of multiple people. While the statements were incriminating to the co-defendants, Richardson suffered no prejudice to render his trial fundamentally unfair. This claim is denied.

5.   Jury Question

Finally, Richardson argues that his due process rights were violated when the trial court refused to provide guidance in response to the mid-deliberation jury question regarding the application of the preponderance of the evidence standard.

Standard

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991). Federal habeas relief is available for instructional error only if the error "'so infected the entire trial that the resulting conviction violate[d] due process.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)).

The omission of an instruction is less likely to be prejudicial than a misstatement of the law.  *See Walker v. Endell*, 850 F.2d 470, 475–76 (9th Cir.1987) (citing *Henderson*, 431 U.S. at 155).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155).

Analysis

The Court of Appeal set forth the background of this claim, and then rejected it:

> . . . . [D]efendants challenge the trial court's refusal to provide additional instruction to the jury when it asked the court to explain in layman's terms the meaning of "evidence of other crimes by a defendant proved by a preponderance of evidence." (See section II.D, supra.) Defendants suggest the trial court should have responded to the inquiry by instructing the jury pursuant to CALCRIM No. 375 or inquiring further into the source of the jury's confusion. We conclude defendants have waived this claim.
>
> While the jury was deliberating the morning after the colloquy in which the jury sought clarification of the meaning of evidence of other crimes proved by a preponderance of the evidence, the trial court revisited the question of the correct response to the jury's questions outside the jury's presence. The prosecutor noted that after the jury made its enquiry the previous day, the trial court had told counsel it would not give a layman's definition and that it would instead give the jury the CALJIC instructions it had already received, and that no counsel had raised an objection. Counsel for Rowmond Brown confirmed that all counsel had approved of the court's proposal. The prosecutor went on to recommend returning the jury to the courtroom to instruct it pursuant to CALCRIM No. 375. All four defense counsel objected to reading the CALCRIM instruction to the jury at that point.
>
> Thus, the record shows that defendants consented to the trial court's response to the jury questions. "Where, as here, appellant consents to the trial court's response to jury questions during deliberations, any claim of error with respect thereto is waived." (*People v. Bohana* (2000) 84 Cal. App. 4th 360, 373; *see also People v. Rodrigues* (1994) 8 Cal. 4th 1060, 1193.)

*Brown*, 2011 WL 1197465 *28-29.

In this federal petition, Richardson argues that the trial court should have provided an additional instruction to the jury after it requested a description in layman's terms of one of the jury instructions. But Richardson's trial counsel and the counsel for the other defendants specifically  agreed not to provide new instructions for the jury. RT at 6509. The prosecution then suggested additional instructions be provided, and all defense counsel, including Richardson's trial counsel, objected. RT at 6513-17. Additional instructions were not provided.

33

1    Richardson now argues that additional instructions should have been provided as the prosecutor

2 suggested, though he does not state specifically what should have been stated.  As noted by the

3 Court of Appeal, this claim was waived when trial counsel consented to the course of action and

4 even opposed any further action.  Respondent argues that this claim is procedurally defaulted

5 for failing to object.  Regardless, the court will look to the merits of the claim.

6    Richardson does not argue that the instruction given was incorrect or erroneous, merely

7 that the trial court should have said something further.  Richardson does not provide an example

8 of what should have been said or what would have been appropriate.  Because Richardson's

9 challenge of the jury instruction is solely a matter of state law, he must demonstrate that the trial

10 court's actions "'so infected the entire trial that the resulting conviction violate[d] due process.'"

11 *Henderson*, 431 U.S. at 154.  He presents no arguments on how the trial court's answer to the

12 jury question and the jury instructions resulted in a due process violation.  The arguments

13 presented in his traverse merely repeat the allegations regarding the Michael Thompson murder

14 evidence that was denied above.  Richardson's conclusory and unsupported claim is denied

15

16                    **A CERTIFICATE OF APPEALABILITY WILL ISSUE**

17    Petitioner has "made a substantial showing of the denial of a constitutional right," 28

18 U.S.C. § 2253(c)(2), and reasonable jurists would find debatable the district court's assessment

19 of petitioner's claim regarding the admission of evidence of the prior murder.  *See Slack v.*

20 *McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is GRANTED

21 for the admission of evidence claim regarding the prior murder.  A certificate of appealability

22 will not issue as to the remaining claims because reasonable jurists would not "find the district

23 court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484.

24 Petitioner is cautioned that the court's ruling on the certificate of appealability does not relieve

25 him of the obligation to file a timely notice of appeal if he wishes to appeal.

26

27

28

**CONCLUSION**

The petition for writ of habeas corpus is denied on the merits.

The clerk will close the file.


IT IS SO ORDERED.


DATED: October 3, 2013

_____
SUSAN ILLSTON
United States District Judge